UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x

STEVEN HELLMAN,

            Plaintiff,

-against-

AFRICA ISRAEL INVESTMENTS LTD.,

           Defendant.

----------------------------------------x

Civil Action No.: 13-CV-8834(DLC)

**COMPLAINT WITH JURY DEMAND**

      Plaintiff Steven Hellman ("Hellman"), by his attorneys, Pavia & Harcourt, LLP, for his Complaint, against Africa Israel Investments Ltd. ("AFI") alleges as follows:

### OVERVIEW OF THE ACTION

      1.      In 2010, Plaintiff Hellman, a New York resident, and Defendant AFI, an Israeli company, negotiated an agreement for Hellman to become an employee of AFI with the position of CEO of AFI Development PLC ("AFID"), an AFI subsidiary operating in Russia. The position required Hellman to move to Moscow from his home in New York. The parties orally agreed to the terms, which were memorialized in a term sheet (the "Contract Term Sheet") that AFI ratified in email exchanges between and among itself, its agent in New York and Hellman.

      2.      The parties agreed that in the event that AFI terminated Hellman before June 30, 2010, AFI would pay him a $500,000 "break up" fee. This provision was significant to Hellman because if he accepted the position, he would forego other business opportunities and relocate to Moscow. Hellman wanted to be compensated for the expenses incurred and opportunities lost in the event that AFI terminated him within the first three months of his employment.

3. AFI agreed to this term, and in March 2010, in reliance upon it and the other terms contained in the Contract Term Sheet, Hellman moved from New York to Moscow.

4. Shortly after the move to Moscow it became clear to Hellman that (1) AFID was poorly managed; and (2) AFI wanted Hellman to rubber-stamp directives from AFI's executives, Lev Leviev and Izzy Cohen, which violated duties owed by Hellman to AFID's shareholders and applicable laws.

5. Hellman criticized AFI's improper and illegal involvement in AFID's affairs and informed Messrs. Leviev and Cohen about other illegal activities at AFID. AFI's response was to terminate Hellman's employment on May 23, 2010.

6. Hellman was entitled to the $500,000 break-up fee because AFI fired him before June 30, 2010. However, AFI refused to honor that commitment. Worse still, it is now apparent that AFI never intended to do so, and agreed to the term solely to induce Hellman to move to Moscow.

## THE PARTIES

7. Plaintiff Steven Hellman is a resident of the State of New York and the County of New York.

8. Defendant Africa Israel Investments ("AFI") is a publicly traded company organized under the laws of the State of Israel and based in Israel.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), in that this is a dispute between a citizen of the State of New York and a corporation organized under the laws of the State of Israel, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10. This Court has personal jurisdiction over defendant AFI pursuant to New York's long-arm statute, CPLR § 302(a)(1), because the causes of action set forth herein arise from AFI's negotiation and entry into a contract in New York with a New York citizen. Jurisdiction over AFI is also consistent with the due process clause of the Fourteenth Amendment of the United States Constitution.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that plaintiff resides in this judicial district and a substantial part of the events and omissions giving rise to plaintiff's claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

12. In 2009, representatives of AFI communicated with Hellman about the possibility of employing him. These negotiations were led by Richard Marin, AFI's agent in New York. From the outset, Marin made it clear to Hellman that he was acting as the authorized agent for AFI in the negotiations.

13. On or about January 20, 2010, the parties agreed to the terms contained in the Contract Term Sheet

### A.     The Contract

14. AFI and Hellman agreed to the following terms for Hellman's employment by AFI as CEO of AFID:

   a. Hellman would have full executive authority over AFID's affairs, including the ability to hire and fire AFID employees.

   b. Hellman's contract term would be 3 years – from February 15, 2010 through February 15, 2013 -- but there would be a trial period for Hellman's employment through June 30, 2010 (the "Trial Period").

      c. If AFI terminated Hellman's employment during the Trial Period, it would not have to pay Hellman any stock options, or the balance of his salary for the full length of the contract term, or a pro-rated bonus, but AFI would have to pay Hellman a $500,000 break-up fee.

**B.**     <u>**Hellman Begins Work In Moscow**</u>

15. Based on the promises made to him by AFI in the Contract Term Sheet, on or about March 15, 2010, Hellman moved to Moscow and began work as the CEO of AFID.

**C.**     <u>**AFI Terminates Hellman's Employment**</u>

16. On May 23, 2010, AFI terminated Hellman's employment.

17. Hellman had fully performed under the terms of his employment with AFI at the time of his termination.

18. AFI terminated Hellman without cause in retaliation for his refusal to permit AFI to interfere with AFID's operations (in violation of the terms of Hellman's employment and also laws of corporate governance), and because Hellman refused to condone AFI's illegal conduct in connection with AFID.

19. Specifically, before Hellman's employment, AFI entered into an agreement with its bondholders to avoid default by swapping debt for equity of AFI and AFID. With respect to AFID, the debt/equity exchange was based in large measure on the net equity as published in the first quarter financial statements of AFID. AFI's CEO, Cohen, asked Hellman to verify the accuracy of AFID's financials and sign them. Hellman informed Cohen that the financial statements contained a material misrepresentation because they omitted an encumbrance on a significant AFID asset that significantly reduced AFID's overall value from the value reported on the financial statements (which, in turn, would have increased the amount of equity

transferred by AFI to the bondholders). However, rather than correct the misrepresentation, Cohen had someone else at AFID sign the financial statements and publish them as true and correct, thereby defrauding AFI's bondholders.

20.     This incident shows that from the very beginning AFI demanded that Hellman act in a way contrary to law and the best interests of AFID's shareholders, and that it would not tolerate Hellman's opposition.

21.     Hellman's reports to AFI of other improprieties were similarly ignored. For example, AFI's CEO, Leviev, maintained a large number of personal employees on the AFID payroll. Hellman informed AFI (through Cohen) that this was not acceptable, and that it would have to be addressed, but Cohen told Hellman not to raise the issue with Leviev.

22.     Hellman also discovered that Leviev caused AFID to make charitable contributions of $350,000 per month to Jewish charities in Russia. Such charitable contributions required the consent of the AFID board, which Leviev never obtained.

23.     The final straw occurred when Leviev threatened the success of AFID's most important project, the Mall of Russia (the "Mall"), a $500 million retail complex, by ordering Hellman to replace a valued AFID employee with Leviev's daughter.

24.     The person responsible for the critical function of leasing space at the Mall was Natalie Shmurin – AFID's vice president for marketing. Leviev asked Hellman to evaluate Shmurin's capabilities and he did so by working closely with her over the course of a month. Shmurin met all of Hellman's expectations. Hellman determined that she was performing well in this critically important responsibility and that Shmurin would be a key player in helping AFID meet the Mall's 'do or die' completion date of the close of 2010.

25.     Nevertheless, Leviev demanded that Hellman fire Shmurin and replace her with his daughter, Tzvia Leviev ("Tzvia"). Tzvia was wholly unqualified to be the leasing manager because, among other reasons, she was not fluent in Russian and had no experience in the Moscow retail market, and hiring Leviev's daughter raised serious concerns about nepotism.

26.     Hellman informed Leviev that he would not fire Shmurin and replace her with Tzvia. In response, Leviev shouted:

> "I don't care if this is a public company. This is my company and if I tell you do something, you do it. If I tell you not to do something, you don't do it. First I recommended you put Tzvia in charge of leasing activity. Then I asked you. Now I am ordering you to fire Natalie and replace her with Tzvia."

27.     Leviev's dictate violated the terms of the employment agreement between Hellman and AFI, which required Hellman have:

> full executive authority within the parameters of approved business plans, including hiring and firing, spending authorization, etc . . . All members of the AFID management team will report to [Hellman] with an organization chart and management procedures that will be put in place and agreed with the parent company management.

28.     Moreover, Leviev's insistence on placing his daughter in an important position at AFID for which she was not qualified was a breach of duty to AFID shareholders.

29.     A week after Hellman refused to carry out Leviev's order to fire Shmurin and replace her with Tzvia, AFI terminated Hellman's employment.

### D.     AFI Informs Hellman It Will Not Pay the Break-Up Fee

30.     After his termination, AFI informed Hellman that it would not honor the terms of its agreement with Hellman and it would not pay Hellman the $500,000 break-up fee.

31.     A few months after his termination, Hellman met with Leviev and again demanded that AFI honor its commitment and pay the break-up fee. During that meeting,

Leviev acknowledged that AFI owed the $500,000, but said that such agreements were only the basis for a negotiation, and offered to pay Hellman less than the $500,000 owed.

### E. The Israeli Litigation

32. In response to AFI's breach of the terms of his employment, Hellman filed suit against AFI (and others) in Israel. AFI asked the Israeli court to dismiss the action on, among other grounds, the inconvenience of the Israeli forum, and to order the case litigated elsewhere.

33. The Israeli court granted AFI's motion to dismiss on forum selection grounds.

34. Unable to sue AFI in Israel, Hellman now brings his claims against AFI in this Court.

## JURY DEMAND

35. Hellman hereby demands a trial by jury.

## COUNT ONE

## BREACH OF CONTRACT

36. Plaintiff re-alleges paragraphs 1 through 35 above as if fully set forth herein.

37. Hellman and AFI entered into a binding and enforceable contract regarding the terms of Hellman's employment. Those terms were memorialized in the Contract Term Sheet, which was electronically signed by AFI through emails confirming AFI's acceptance of its terms.

38. Under the terms of the employment agreement AFI was obligated to pay Hellman $500,000 if AFI terminated Hellman's employment prior to June 30, 2010.

39. AFI terminated Hellman's employment on May 23, 2010.

40. Hellman fully performed all of his obligations under his agreement with AFI through the date of his termination.

41. AFI has not paid Hellman the $500,000 break-up fee despite Hellman's demand for payment.

42. For the foregoing reasons, Hellman is damaged in an amount to be determined at trial, but in no event less than $500,000.

## COUNT TWO

## FRAUD

43. Plaintiff re-alleges paragraphs 1 through 42 above as if fully set forth herein.

44. Upon information and belief, when AFI entered into the employment agreement with Hellman, it had no intention of ever paying the $500,000 break-up fee if it became due.

45. Hellman's belief is based on numerous facts, including: (i) AFI's history of reneging on employment agreements with senior executives and then forcing them to sue to enforce their rights; (ii) after Hellman's termination, AFI confirmed that it had a contractual obligation to pay the break-up fee, but still refused to pay it, and instead tried to negotiate a better deal; and (iii) after Hellman relocated to Moscow he learned that AFI's strategy during the negotiations leading up to Hellman's employment was to reach an agreement to induce Hellman to entrench himself in Moscow, but that it planned on terminating his his employment without paying the break-up fee if he and Leviev did not have "good chemistry".

46. AFI's representation to Hellman that it would pay him a $500,000 breakup fee if he was terminated prior to June 30, 2010 was knowingly false when made.

47.     Hellman was induced to relocate to Moscow and turn down other business opportunities in reasonable reliance on AFI's representation that it would pay him $500,000 if he was terminated prior to June 30, 2010.

48.     Hellman was damaged by his reasonable reliance in AFI's false statements in an amount to be determined at trial but in no event less than $500,000.

**WHEREFORE,** Plaintiff respectfully requests:

A.     Judgment in favor of Plaintiff on all Counts.

B.     An award of damages to be determined at trial.

C.     An award of punitive damages as applicable under law.

E.     Pre- and post-judgment interest.

F.     An award for all costs of suit, including reasonable attorneys' fees, costs, and expenses incurred in the prosecution of the action.

G.     Such other and further relief as the Court may deem equitable, just and proper.

Dated:     New York, New York
           December 12, 2013

PAVIA & HARCOURT LLP

By: _____
    Adam Mitzner (AM-8325)
    Jonathan A. Selva (JS-2006)

590 Madison Avenue, 8th Floor
New York, New York 10022
(212) 980-3500
(212) 735-7918 (facsimile)

Attorneys for Plaintiff Steven Hellman

P&H - 812331.3